❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* 7210 W. Capitol Drive, Milwaukee, Wisconsin, to include all associated common spaces, basement, garage, outbuildings, and identified vehicles, as further described in Attachment A-1 | )<br>)<br>)<br>)<br>)<br>) Case No.  23-901M(NJ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before      May 5, 2023      *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      Hon. Nancy Joseph      .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*     ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:      4/21/2023 @ 1:32 p.m.

*Judge's signature*

City and state:    Milwaukee, Wisconsin                    Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-1

### Property to be searched

7210 W. Capitol Drive, Milwaukee, Wisconsin, to include all associated common spaces, basement, garage, outbuildings, and vehicles to include a black 2021 Dodge Durango Hellcat with VIN: 1C4SDJH90MC643328, a black 2019 Mercedes Benz GLE bearing WI Registration ANP8319, a black Audi Q7 bearing WI Registration 344LXC, a gray 2014 Audi S7 bearing WI Registration ASK355, a Black Audi Station wagon, and a black BMW 6 Series at this address. This property is used by Rayvon **Edwards**. This address is further described as an automotive repair shop/car dealership having blue and gray brick siding and green wood boards over the south facing windows. The structure has two sets of east facing pedestrian glass doors that lead into the main lobby of the auto shop and four overhead garage doors facing east leading into the auto garage portion of the structure. The structure has the numbers "7210" posted over the east facing pedestrian doors, which lead into the parking lot of the lot.



1

**ATTACHMENT B**

Property to be seized

All evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (Distribution of and possession with intent to distribute controlled substances) and Section 846 (Conspiracy to possess with intent to distribute and to distribute controlled substances), those violations involving Rayvon Edwards, including:

1.      Controlled substances, controlled substance analogues, or listed chemicals;

2.      Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

3.      Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

4.      Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

5.      Firearms, ammunition, magazines, gun boxes, firearm purchase records or receipts, and other paraphernalia associated with firearms;

6.      Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

7.      Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

8.      Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting

1

names, addresses, purchases, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

9.      Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

10.      Cellular telephones, Smartphones, text messaging systems, and other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

11.      Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

12.      Indicia of occupancy, residency or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

13.      Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances; and

14.      Computers, cellular telephones, or storage media used as a means to commit the violations described above.

15.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

c.      evidence indicating the computer user's state of mind as it relates to the crime under investigation;

2

d.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.    evidence of the times the COMPUTER was used;

g.    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.    records of or information about Internet Protocol addresses used by the COMPUTER;

j.    records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k.    contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

3

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

This warrant authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of Edwards to the fingerprint scanner of a device found at the premises; and/or (2) hold a device found at the premises in front of Edwards's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device to search the contents as authorized by this warrant.

4

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>7210 W. Capitol Drive, Milwaukee, Wisconsin, to include all<br>associated common spaces, basement, garage, outbuildings,<br>and identified vehicles, as further described in Attachment A-1 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   23-901M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

located in the _____Eastern_____ District of _____Wisconsin_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Distribution of and possession with intent to distribute controlled substances, and conspiracy to distribute and possess with intent to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI TFO Ryan Reagan
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means).*

Date:   4/21/2023

_____
*Judge's signature*

City and state:   Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A
# CRIMINAL COMPLAINT AND WARRANTS TO SEARCH AND SEIZE

I, Ryan Reagan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for (1) a criminal complaint and arrest warrant for **Rayvon D. Edwards** (DOB: XX/XX/1993); and (2) warrants, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search the following premises, collectively the **SUBJECT PREMISES**, more fully described in Attachments A-1 – A-3, for the things described in Attachment B:

   a.   **7210 W. Capitol Drive, Milwaukee, Wisconsin, SUBJECT PREMISES 1;**

   b.   **11346 N. Buntrock Avenue, Mequon, Wisconsin, SUBJECT PREMISES 2; and**

   c.   **6088 N. 41st Street, Milwaukee, Wisconsin, SUBJECT PREMISES 3.**

2.     I have over eight years of experience as a law enforcement officer through the Milwaukee Police Department (MPD). I am currently assigned to the Milwaukee Police Department's Special Investigations Division, which is involved in the investigation of offenses involving, but not limited to, narcotics, narcotics trafficking, and individuals prohibited from possessing firearms within the City of Milwaukee. As of November 2021, I've been assigned and attached as a Federally Deputized Task Force Officer (TFO) with the Federal Bureau of Investigation's Milwaukee Area Safe Streets Task Force. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by the law to conduct investigations of and to make arrests for federal felony arrests.

3.     As a Police Officer and a Task Force Officer, I have participated in the investigation of numerous narcotics-related offenses, resulting in the prosecution and conviction of individuals

1

and the seizure of illegal drugs, weapons, United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, analysis of phones and the arrests of numerous drug traffickers. I have also been the affiant of many search warrants.

4.      Additionally, I have spoken with other experienced narcotics investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Furthermore, I have attended training courses that specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become aware with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

5.      Based on my training, experience, and participation in drug trafficking investigations and associated financial investigations involving controlled substances, I know and have observed the following:

     a.      I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own, use and exercise dominion and control over these assets;

2

b. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

c. Drug traffickers frequently possess firearms and ammunition to protect their illegal product;

d. I know that drug traffickers engaged in mobile drug trafficking often use their vehicles to facilitate their trafficking activities by transporting and/or securing contraband including but not limited to controlled substances, packaging materials and other tools of the drug trade, drug proceeds, and firearms;

e. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses, vehicles, or other locations over which they maintain dominion and control;

f. I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

g. It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

6. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize

3

computer hardware and software which are (1) instrumentalities, fruits, or evidence of a crime, or (2) storage devices for information about crime.

7. To this end, based upon my training and experience, I know that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs. I also believe that it is common for crime suspects who possess illegal controlled substances and firearms to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell.

8. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

## PROBABLE CAUSE

10. The United States, including the FBI and the FBI's Milwaukee Area Safe Street Task Force (MASSTF), are conducting a criminal investigation of **Rayvon D. Edwards** regarding possible violations of 21 U.S.C. §§ 841(a)(1) and 846 (distribution of and possession with intent to distribute controlled substances, and conspiracy to distribute and possess with intent to distribute

4

controlled substances). The evidence reveals that **Edwards** is involved in the trafficking of fentanyl, cocaine, and heroin.

11.    The investigation to date has included traditional law enforcement methods, including, but not limited to: interviews with confidential sources and sources of information; controlled purchases of narcotics; documentary evidence; telephone toll data; and physical surveillance.

## Confidential Human Sources

12.    Case agents have received information concerning the illegal drug trafficking activities of **Rayvon Edwards** from a confidential source (hereinafter "CHS #1"). CHS #1 stated that Edwards trafficked in heroin and cocaine and that Edwards obtained multiple kilograms of the same on an approximate weekly basis. CHS #1 has provided information about the membership, structure, and customs of **Edwards's** drug trafficking organization. CHS #1 has positively identified **Edwards** as the leader of that drug trafficking conspiracy through a Milwaukee Police Department booking photo. In March 2022 CHS #1 was with **Edwards** in a black BMW sedan, which is one of **Edwards's** vehicles.  CHS #1 observed approximately one kilogram of cocaine, which was in a smell-proof plastic wrap packaging and which was partially unwrapped.  CHS #1 stated **Edwards** was selling this cocaine in at least ounce quantities for $900 an ounce. CHS #1's information regarding **Edwards**'s drug trafficking organization has been corroborated by other investigations into **Edwards** and his associates, information obtained from various public databases including Experian, phone data, Wisconsin Circuit Court Access Program, physical surveillance, and other investigative information. CHS #1's information has never been found to be false or misleading.

13.     CHS #1 has been providing reliable information to the Federal Bureau of Investigation since March 2022. Specifically, CHS #1 provided information that directly led to a search warrant, which led to the recovery of three firearms and a distribution-level quantity of marijuana and crack cocaine to a person unrelated to **Edwards**. The information provided by CHS #1 is consistent with the evidence obtained elsewhere in this investigation, and substantial parts of CHS #1's information have been corroborated through independent investigations, including information obtained from various public databases, physical surveillance and electronic surveillance. CHS #1 has a criminal history that includes theft, property damage, trespass, drug trafficking and vehicle and traffic violations. CHS #1 is receiving consideration in connection with pending drug and firearms cases from the Milwaukee County District Attorney's office for his/her cooperation with law enforcement. CHS #1 has also been arrested and charged with possession of marijuana, possession of drug paraphernalia and bail jumping and released on bond. For these reasons, case agents consider CHS #1 to be reliable.

14.     Investigators developed an additional confidential human source herein referred to as CHS #2 regarding **Edwards's** drug trafficking activities. CHS #2 has provided information about the membership, structure, and customs of **Edwards's** drug trafficking organization. CHS #2 stated that **Edwards** is a large-scale supplier of heroin and cocaine in the greater Milwaukee area and that **Edwards** is known to be in possession of $100,000 on his person at a time. CHS #2 has observed **Edwards** in possession of a kilogram of heroin in a vehicle within the past three months of June 2022 but could not recall a location or date. CHS #2 stated that CHS #2 purchased heroin and cocaine from **Edwards** on multiple occasions leading up to June 2022.

15.     CHS #2 has been providing information related to **Edwards** since June 2022. CHS #2 has positively identified **Edwards** as the leader of that drug trafficking conspiracy through a

6

Milwaukee Police Department booking photo. CHS #2's information concerning **Edwards's** drug trafficking organization has been corroborated by other investigations into **Edwards** and his associates, information obtained from various public databases including Experian, phone data, Wisconsin Circuit Court Access Program, physical surveillance, and other investigative information. CHS #2's information has never been found to be false or misleading.

16.     CHS #2 has prior State of Wisconsin convictions for drug trafficking and a firearm offense. CHS #2 was questioned and provided information both known and unknown to investigators. The information provided by CHS #2 regarding the **Edwards's** investigation is corroborated and is found to be reliable. The known information that CHS #2 provided regarding the **Edwards's** investigation is the location **Edwards** operates out of, the vehicles known to be used by **Edwards**, the identity of his girlfriend, the paying of associate drug traffickers' bail, **Edwards's** phone number, the quantity of drugs that **Edwards** is trafficking, and the quantity of currency **Edwards** is known to possess. CHS #2 is cooperating in exchange for consideration in connection with arrests and charges for drug trafficking and firearms offenses.

## Identification of SUBJECT PREMISES

17.     Both CHS #1 and CHS #2 provided an address of **7210 W. Capitol Drive, Milwaukee, Wisconsin**, or **SUBJECT PREMISES 1**, as an auto shop that **Edwards** purchased and was in the process of refurbishing to run as a legitimate source of income. However, according to CHS #1, **Edwards** was paying for the refurbishing of the auto shop with proceeds of the drug trafficking.

18.     A check of Wisconsin Department of Transportation records revealed **Edwards** provided the address of **SUBJECT PREMISES 1** on November 3, 2021 as his listed address.

7

19.     In April 2023 a utility check was conducted for **SUBJECT PREMISES 1**, which listed Lavish Tuning LLC as the responsible party along with **Rayvon Edwards** and Daje Hunter as the points of contact with the phone number 414-446-0856.  Case agents contacted the Wisconsin Department of Financial Institutions via an open records request regarding any corporations associated with **Edwards** or Daje M. Hunter, which revealed that **Edwards** was the registered agent of Lavish Tuning Auto Repair LLC located at **SUBJECT PREMISES 1**, and that the account has been active since September 2021.

20.     Case agents are aware from interviews with CHS #1 and CHS #2 that "Daje" is Edwards's girlfriend with whom he resides. Case agents conducted a search of law enforcement resources and located a Daje M. Hunter (B/F XX/XX/1998).  Both CHS #1 and CHS #2 were provided with a Wisconsin Department of Transportation photograph of Daje M. Hunter to which they both identified Daje Hunter as the girlfriend of **Edwards**.  Both CHS #1 and CHS #2 reported meeting Hunter on multiple occasions and were aware through conversations with **Edwards** that this was **Edwards's** girlfriend.

21.     In October 2022 CHS #2 informed investigators that **Edwards** recently moved from his residence on S. Lake Drive.  CHS #2 believed the new residence was north of the City of Milwaukee in the suburbs based on conversations CHS #2 had with **Edwards**.

22.     On October 26, 2022, court-authorized GPS pings from **Edwards's** phone number 414-748-9891 (the 9891 Phone) reflected that **Edwards's** 9891 Phone was staying overnight in the area around 11300 W. Buntrock Avenue, Mequon, Wisconsin.  Special Agent Nicholas Rupnick traveled to that area and observed a gray Audi S7 bearing WI auto plate AMH8442 parked in front of the garage at **11346 N. Buntrock Avenue, Mequon, Wisconsin**, or **SUBJECT PREMISES 2**.  Case agents know this vehicle from personal observations and remote static

8

surveillance to be driven by **Edwards** and have observed it at **SUBJECT PREMISES 1**. Case agents conducted a search of open law enforcement resources using Hunter's identifiers, which revealed Hunter had active accounts at **SUBJECT PREMISES 2**. SA Rupnick spoke with Detective Lance Wegner of the Mequon Police Department who conducted a check of their Automatic License Plate Reader system for ANP8319, which is the plate associated with a Black Mercedes GLE, which Daje Hunter is known to operate. Detective Wegner located a trend of that vehicle being operated in the area around the residence from around October 3, 2022 to the present.

23.     A check of utility records for **SUBJECT PREMISES 2** in April 2023 revealed that Hunter has an active account for **SUBJECT PREMISES 2** and has since October 2022.

24.     In April 2023, case agents served a subpoena to Mequon Spur 16 LLC, which owns **SUBJECT PREMISES 2**. The subpoena revealed that Daje Hunter is listed as the lessee for the residence.

25.     CHS #1 stated that **Edwards** had begun talking to another female who resided around N. 41st and W. Florist Avenue in Milwaukee, Wisconsin. On May 9, 2022 case agents conducted an analysis of toll records for **Edwards's** phone number 414-491-2298 (the 2298 Phone) and located 85 phone calls between **Edwards** and phone number 414-640-1567. Case agents conducted checks on law enforcement databases, which reflected that Laquonda Criss was associated with phone number 414-640-1567. Case agents through Milwaukee Police Department records and Wisconsin Department of Transportation records located Laquonda T Criss (DOB: XX/XX/1996), who resided at **6088 N. 41st Street, Milwaukee, Wisconsin**, **SUBJECT PREMISES 3**, which is near N. 41st Street and W. Florist Street, as described by CHS #1.

9

26.     A utility check was conducted in April 2023 on **SUBJECT PREMISES 3**, which revealed that Laquonda Criss has an active account at **SUBJECT PREMISES 3** and has since November 2021

27.     CHS #1 stated that on May 8, 2022, **Edwards** and CHS #1 went to **SUJBECT PREMISES 3**. CHS #1 stated they were in **Edwards's** Black BMW 6 series and **Edwards** had a white Icon brand bag, which contained three large bricks that were wrapped in plastic, which CHS #1 knew through experience to contain kilograms of cocaine.  CHS #1 stated **Edwards** entered the residence with a key and then returned from the residence without the bag.  Based on their training, experience, and familiarity with this investigation, case agents know that this interaction is consistent with **Edwards** using the residence as a "stash house," which case agents know to be a residence that drug dealers will use to store large amounts of drugs. CHS #1 described the residence as an apartment building with each apartment having its own entry door along the apartment with an entry door that faces east and has a satellite dish that stands on the ground near the entry door.  Case agents conducted surveillance at Criss's residence at **SUBJECT PREMISES 3** and observed her residence was  consistent with CHS #1's description.

28.     A check of Wisconsin Department of Transportation records revealed Laquonda Criss provided the address of **SUBJECT PREMISES 3** on December 26, 2021 as her listed address.

**Controlled Buy #1 from Rayvon Edwards**

29.     On November 16, 2022 CHS #2 conducted a controlled purchase of cocaine and heroin from **Edwards**.[1]  Prior to the controlled buy, CHS #2 placed a consensually recorded phone call to **Edwards's** 9891 Phone, wherein **Edwards** and CHS #2 discussed the sale of "two zaps and 15 grits" for "2250," consistent with a drug transaction.

30.     On November 16, 2022, prior to the controlled buy, **Edwards** was observed via remote static surveillance at **SUBJECT PREMISES 1** with a small black bag that appeared to have items inside along with a hammer.  **Edwards** entered a black Audi Q7 bearing WI auto plate 344LXC and departed the location.   A short time later **Edwards** was observed arriving at **SUBJECT PREMISES 2** via remote static surveillance.

31.     Shortly after **Edward's** arrival at **SUBJECT PREMISES 2**, CHS #2 placed the recorded phone call for two ounces of cocaine and 15 grams of heroin, during which **Edwards**

---

[1]     Based upon my training and experience, I know that a "controlled buy" is a law enforcement operation in which a confidential source purchases drugs from a target.  The operation is conducted using surveillance, usually audio and video recording equipment, and pre-recorded purchase money. When a confidential source is used, s/he is searched for contraband, weapons, and money before the operation. The confidential source is also equipped with a recording and monitoring device. When the transaction is completed, the confidential source meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The confidential source is again searched for contraband, weapons, and money. The recording equipment is reviewed to determine consistency with confidential source statements and law enforcement surveillance. A sample of the suspected drugs is then field tested by case agents for the presence of controlled substance and then placed in inventory pursuant to normal inventory procedures.

The above-stated standard controlled buy protocols were followed during all controlled buys.

directed CHS #2 to meet him in the area of N. 38th Street and W. Florist Street in the City of Milwaukee, which is in the area of **SUBJECT PREMISES 3**. A short time after the phone call, SA Rupnick observed the black Audi Q7 leave from **SUBJECT PREMISES 2** and then a short time later enter the general area in which **Edwards** directed CHS #2. TFO Martez Ball went to the location of **SUBJECT PREMISES 3** and observed the Audi parked in the rear shared parking lot of the location. TFO Ball then observed **Edwards** exit the rear door of the residence towards the parking lot and enter the driver seat of the Audi. A few minutes later the Audi arrived at the location CHS #2 had been waiting and CHS #2 followed the Audi into an alleyway at the location. **Edwards**, while in the Audi, and CHS #2 had a short exchange in the alleyway and then departed in different directions. CHS #2 arrived with control officers at the predetermined location and informed control officers that **Edwards** arrived to the location in a black Audi and entered an alleyway at the location which CHS #2 followed him into. CHS #2 stated that in the alleyway, CHS #2 pulled alongside **Edwards's** vehicle and exchanged the pre-recorded U.S. currency for two clear plastic sandwich bags containing cocaine and heroin. Laboratory testing revealed that the off-white powdery substance contained cocaine and weighed approximately 55.2 grams. Laboratory testing revealed that the tan, rock-like substance contained heroin, fentanyl, cocaine, and xylazine and weighed approximately 14.5 grams.

### Controlled Buy #2 from Rayvon Edwards

32. On February 6, 2023, case agents conducted a controlled purchase of crack cocaine and heroin from **Edwards**. Before the controlled buy, court-authorized GPS pings from **Edwards's** phone number 414-553-4801 (the 4801 Phone) and remote static surveillance reflected that **Edwards's** 4801 Phone was at his residence, **SUBJECT PREMISES 2.** Case agents

12

observed **Edwards** depart the location and subsequent GPS pings on **Edwards's** 4801 Phone and remote static surveillance reflected **Edwards** arrived at **SUBJECT PREMISES 1.**

33.     CHS #2 met with case agent and conducted a recorded phone call with **Edwards's** 4801 Phone to facilitate the controlled buy.  During the recorded phone call, CHS #2 requested a "zap and a half and ten grits," meaning an ounce and a half of crack cocaine and 10 grams of heroin.  **Edwards** informed CHS #2 that he would let CHS #2 know and would call CHS #2 back. **Edwards** called CHS #2 back and directed CHS #2 to meet in the area of N. 39th Street and W. Florist Street in the City of Milwaukee.

34.     Case agents searched CHS #2 and CHS #2's vehicle for any money or contraband and then provided CHS #2 with $1,750 in pre-recorded U.S. currency for the purchase of one and a half ounces of crack cocaine and ten grams of heroin.  CHS #2 then departed for the predetermined meet location with **Edwards**.  Visual surveillance was maintained of CHS #2 throughout the controlled buy.

35.     Using remote static surveillance, aerial and in-person surveillance, case agents followed **Edwards**, operating a black Dodge Durango, from **SUBJECT PREMISES 1** to **SUBJECT PREMISES 3**.  Surveillance observed **Edwards** enter **SUBJECT PREMISES 3** and then leave the residence carrying a clear plastic sandwich bag containing an off-white substance in his hand, which was suspected to be cocaine.  Surveillance observed **Edwards** enter the Dodge and drive to the pre-determined meet location of N. 37th Street and W. Florist Street in the City of Milwaukee and enter an alleyway. CHS #2 followed **Edwards** into the alleyway and pulled CHS #2's vehicle next to **Edwards's** vehicle.  **Edwards** and CHS #2 had an exchange through CHS #2's driver window and **Edwards's** front passenger window. CHS#2 then departed the location with surveillance officers following to the pre-determined meeting location.

13

36.     CHS #2 met with cases agents and stated that in the alleyway, CHS #2 handed **Edwards** the pre-recorded $1,750 and **Edwards** handed CHS #2 two knotted clear plastic sandwich bags containing crack cocaine and heroin.  Case agents recovered the two sandwich bags from CHS #2's vehicle and observed one contained an off-white rock-like substance, which was suspected to be crack cocaine, and the other contained a tan rock-like substance, which was suspected to be heroin.

37.     Laboratory testing revealed that the off-white rock-like substance contained cocaine and weighed approximately 27.2 grams. Case agents subjected the purchased heroin to the Nark II 01, 11, 33 field tests, which tested positive for heroin and fentanyl with a weight of 11.3 grams.

### Controlled Buy #3 from Rayvon Edwards

38.     Case agents along with CHS #2 conducted a third controlled buy from **Edwards** on April 12, 2023 for two ounces of crack cocaine and 12 grams of heroin for $2,500.  Case agents reviewed remote static surveillance on April 12, 2023, which revealed that **Edwards** departed **SUBJECT PREMISES 2** at approximately 7:24 a.m. At approximately 12:04 p.m. case agents located the vehicle that **Edwards** left his residence in across the street from **SUBJECT PREMISES 3** and then observed **Edwards** exited **SUBJECT PREMISES 3** at 12:11 p.m.  While monitoring remote static surveillance video, **Edwards** was observed arriving at **SUBJECT PREMISES 1** at 12:40 p.m.

39.     Case agents and CHS #2 met at 12:27 p.m. and began making multiple recorded phone calls to **Edwards** using the 4801 Phone to facilitate the controlled buy. The first four phone calls went unanswered.  CHS #2 then received a phone call from **Edwards's** 4801 Phone. The person that called CSH #2 identified himself as **Edwards**'s "Brother," who CSH #2 believed to

14

be a close associate of **Edwards**. The caller informed CHS #2 that he was bringing **Edwards** the phone and that **Edwards** would be in contact with CHS #2 soon. At 1:35 p.m., CHS #2 made a recorded phone call to the 4801 Phone, and **Edwards** answered. During the phone call, **Edwards** confirmed the transaction and amount of cocaine and heroin to be purchased by CHS #2. **Edwards** informed CHS #2 that he (**Edwards**) would have to go to Florist, believed to be **SUBJECT PREMISES 3**, and get the drugs.

40. Case agents conducted a search of CHS #2's person and vehicle for any contraband and money and did not locate any. CHS #2 was then provided with $2,500 for the purchase of two ounces of crack cocaine and 12 grams of heroin. CHS #2 departed the meeting location and traveled to N. 36th Street and W. Florist Avenue, which is within the vicinity of the location at which the previous controlled buys occurred. This location is a few blocks from **SUBJECT PREMISES 3**. Case agents maintained visual surveillance of CHS #2 throughout the duration of the controlled buy. Shortly after the completion of the phone call with CHS #2 over the 4801 Phone, **Edwards** was observed leaving **SUBJECT PREMISES 1** and arriving across the street from **SUBJECT PREMISES 3** operating a black Audi station wagon. **Edwards** was observed exiting his vehicle and entering into the gangway that the entrance door to **SUBJECT PREMISES 3** is located. **Edwards** was then observed returning to his vehicle approximately two minutes later. **Edwards** was then observed traveling towards the location CHS #2 had been waiting for **Edwards**. **Edwards** was observed in his vehicle approaching the location CHS #2 was parked and entered an alleyway. CHS #2 followed **Edwards** into the alleyway. Case agents observed CHS #2 pull along the driver side of **Edwards's** vehicle and had an exchange through CHS #2's passenger side window and **Edwards's** front driver's window. After the exchange, both vehicles departed the location. **Edwards's** black Audi station wagon was observed arriving back at

15

**SUBJECT PREMISE 1** at approximately 2:11 p.m. and entering the garage. CHS #2 was followed back to the meeting location by case agents. Case agents recovered a clear plastic sandwich bag containing an off-white rock-like substance, which was suspected to be crack cocaine and a clear plastic sandwich bag containing brown rock-like substance which was suspected to be heroin. CHS #2's person and vehicle were searched for any contraband or money, and none was located.

41. The purchased crack cocaine was later subjected to the Nark II 07 field test, which tested for cocaine base with a weight of 51.9 grams with original packaging. The purchased heroin was subjected to the Nark II 11 field test, which tested positive for opiates with a weight of 12.2 grams with original packaging.

42. Based on the above-described controlled buy operations—wherein **Edwards** traveled to **SUBJECT PREMISES 3** before traveling to the control buy locations to conduct the controlled buys with CHS #2—case agents believe that **Edwards** is using **SUBJECT PREMISES 3** as a "stash house." Additionally, during the second controlled purchase, **Edwards** was observed leaving the residence while in possession of a clear sandwich bag containing suspected cocaine, which appeared to be consistent with the packaging of the crack cocaine purchased using CHS #2. This is consistent with **Edwards's** use of **SUBJECT PREMISES 3** as a stash house.

### Historical information involving Edwards and Daje M. Hunter

43. In March 2022 CHS #1 provided the address of 4200 S. Lake Drive, Apartment 464, St. Francis, Wisconsin as the residence for **Edwards (**which is no longer a current residence for **Edwards)**. CHS #1 stated that **Edwards** resided at this residence with Hunter. Further, CHS #1 had been inside the residence on more than five occasions. CHS #1 stated **Edwards** stored and cooked cocaine and heroin at the residence based on personal observations and observed at least a

16

kilogram of cocaine or heroin in the residence on at least 5 different occasions dating back within the past three months of March 2022. CHS #1 stated **Edwards** had a safe in the bedroom of the apartment complex that contained a large quantity of U.S. currency and a large quantity of cocaine and heroin. CHS #1 stated **Edwards** placed door stops behind the front door, the door to the bedroom and the door to the bathroom, which was attached to the bedroom in an effort to increase the time it would take law enforcement authorities to make entry to the residence, allowing **Edwards** to dispose of his narcotics.

44.     In April 2022 CHS #1 provided information that CHS #1 had acquired knowledge from **Edwards** that when **Edwards** meets with his source of supply for cocaine and heroin to purchase multiple kilograms that he will have Hunter operate the vehicle either alone or with **Edwards** in an attempt to avoid law enforcement contact.

45.     CHS #1 stated that in April 2022 that CHS#1 was in a vehicle with Hunter driving and **Edwards** was the front passenger and that they met with William H. Pope, who is known to CHS #1 to purchase ounce quantities of cocaine from **Edwards** on a weekly basis in the area of N. 35th Street and W. Mt. Vernon in the City of Milwaukee. CHS #1 observed **Edwards** deliver two ounces of cocaine to Pope while inside of the vehicle.

46.     CHS #1 told case agents that on April 29, 2022, **Edwards** was in Michigan picking up auto parts and that while he was away, he delegated Hunter to deliver cocaine or heroin to individuals that would call **Edwards** while he was gone. Case agents earlier on this day observed Hunter operating a black Mercedes GLE, which had heavily tinted windows, a tinted license plate cover, green brake calibers and a dealership advertisement plate on the rear of the vehicle. Additionally, CHS #1 reported that Deandre L Johnson (DOB: XX/XX/95) was a drug trafficker who purchased cocaine from **Edwards** to sell to drug users. CHS #1 stated that on April 29, 2022,

17

Johnson was near the area of N. 35th Street and W. Galena Street. Case agents were aware that a residence located at 1649 N. 35th Street, Milwaukee, Wisconsin was associated to Johnson and responded to that area to conduct surveillance. While conducting surveillance, case agents observed a gray Audi SUV arrive at the residence and observed Johnson exit the residence and enter the rear passenger door of the Audi. Case agents conducted a follow of the Audi to the location of N. 28th Street and W. Lisbon Avenue in the City of Milwaukee. Upon the Audi's arrival at the location, case agents observed a black Mercedes GLE already parked at the location. The black Mercedes GLE had the same exterior description as the vehicle Hunter was observed operating earlier in the day. Officers then observed Johnson exit the Audi and enter the rear passenger seat of the Mercedes. After approximately three minutes, Johnson was observed exiting the Mercedes and entering the rear seat of the Audi again. Case agents believe through their training and experience that this interaction between Johnson and the occupant of the Mercedes was consistent with a drug transaction based on the short duration of the interaction and the information provided by CHS #1 that **Edwards** was delegating Hunter to deliver cocaine and heroin on his behalf. Milwaukee Police uniformed officers attempted a traffic stop of the Audi, which resulted in a vehicle pursuit. At the conclusion of the vehicle pursuit Johnson fled from the vehicle on foot but was taken into custody. A search of Johnson's person revealed a clear plastic sandwich bag containing 17 knotted corner cuts containing an off-white chunky substance, which was suspected to be cocaine. A NARC II 07 field test reflected that the substance tested positive for cocaine base and the 17 corner cuts had a total weight of 5.21 grams.

47.     Case agents are aware that law enforcement authorities identified phone number 331-803-1438 as a number used by Deandre Johnson. Case agents conducted an analysis of **Edwards's** 2298 Phone. This analysis revealed 331-803-1438 contacted **Edwards's** 2298 Phone

twenty times on the aforementioned day that Johnson was taken into custody. Based on the observations made of Johnson before his arrest, the observation of the meeting between Johnson and the Mercedes, which is known to be driven by Hunter, and the subsequent recovery of cocaine from Johnson, case agents believe that the amount of contacts between **Edwards** and Johnson were to facilitate the transaction of cocaine from Hunter to Johnson.

48.     On May 15, 2022 **Edwards** was arrested in Chicago, Illinois with 142 grams of crack cocaine and two digital scales in his possession and was subsequently charged by Cook County, IL. White in custody **Edwards** contacted Daje Hunter at her known telephone number.

### Observations at SUBJECT PREMISES 1

49.     On June 22, 2022 case agents identified the Instagram account "realstasher_50k" as an account believed to be used by William Pope, which account reflects pictures and videos of Pope throughout the page. Case agents also located a YouTube account with the name "Real.Stasher.50K," which had posted a music video on June 14, 2022 titled "Coming Down (Official Music Video)." The video depicts William Pope rapping, along with multiple other males in the background. Throughout the video, men in the background can be seen in possession of handguns and rifles inside an auto shop and outside the auto shop near a white semi-truck. The video switches scenes between inside an auto garage and the outside, which depicts a white semi-truck parked in a lot. The video also depicts the males in front of multiple vehicles also parked in the lot.

50.     Case agents reviewed remote static electronic surveillance capturing **SUBJECT PREMISES 1** from June 3, 2022 and found that between approximately 9:00 p.m. and 11:30 p.m. multiple vehicles entered the lot and parked. These vehicles are the same as the ones depicted in the YouTube video and parked in the same locations as in the video. On the remote static electronic

19

surveillance, a tripod stand is visible and being used, and a subject is recording multiple other subjects as they stand in front of the vehicles and in front of a white semi-truck, which is parked in the lot. It appears the video posted on YouTube by William Pope was recorded on June 3, 2022 at **Edwards's** shop.

51.     In May 2022 CHS #1 provided information that CHS #1 knew William Pope to have purchased approximately 20 grams of heroin and one to three ounces of cocaine from **Edwards** for $45 a gram for heroin and $975 an ounce for cocaine approximately every other day between April 2022 until the time Pope was arrested in November 2022. CHS #1 stated that CHS #1 personally observed Edwards provide controlled substances to Pope. CHS #1 stated that one of these exchanges occurred at the auto shop located at **SUBJECT PREMISES 1**.

52.     On July 8, 2022 members of MASSTF conducted surveillance on **Edwards** using the court-authorized location data for **Edwards's** 2298 Phone.  While the location information showed **Edwards's** phone was in the vicinity of **SUBJECT PREMISES 1**, case agents observed William Pope arrive at the location in a gray Dodge Charger.  Case agents observed William Pope and **Edwards** both enter **SUBJECT PREMISES 1** and then exit a short time later. Case agents observed William Pope enter the driver seat of a Dodge Charger and leave the location and travel one block away and park in the 4000 block of North 72nd Street, Milwaukee, Wisconsin near a red Saturn Vue. While parked, a white female exited the Saturn and approached the driver window of Pope's Dodge Charger and had a hand-to-hand exchange with Pope before returning to her vehicle. A traffic stop was later conducted of the Saturn Vue, and the female admitted to purchasing cocaine and heroin from a black male matching Pope's description in a gray Dodge Charger. Law enforcement officers recovered heroin from the Saturn Vue.  Case agents believe

20

that William Pope had arrived at **SUBJECT PREMISES 1** to purchase drugs from **Edwards** and then subsequently left **SUBJECT PREMISES 1** to deliver to the female in the Saturn.

53.      TFO Reagan was made aware of a vehicle pursuit which occurred on July 12, 2022 during which Milwaukee Police Officers Andrew Langer and Justin Torres engaged in a vehicle pursuit of a 2015 Hyundai Sonata driven by Jerold Lee-Brown (DOB: XX/XX/95) throughout the City of Milwaukee. The officers reported that at the end of the pursuit Lee-Brown exited the Sonata and ran to a waiting gray Dodge Charger and entered the back-passenger seat. The Dodge Charger then proceeded to flee officers, which resulted in the termination of the vehicle pursuit.  TFO Reagan obtained a copy of the police reports, which are under Milwaukee Police Case No. 22-193-0174, and the squad car video from the Milwaukee Police squad car and reviewed both.  The pursuit began at approximately 7:38 p.m. from the area of 2111 S. 14th Street, Milwaukee, Wisconsin.  At approximately 7:57 p.m. near N. 28th Street and N. 29th Street and W. St. Paul Avenue in the City of Milwaukee the vehicle drove south through a vacant field towards W. St. Paul Avenue where a gray Dodge Charger with black rims was waiting facing eastbound towards the freeway entrance.  As the Sonata drove through the field, Lee-Brown exited the driver door and began to run towards the Charger. The rear driver side door of the Charger was opened from an occupant from inside the vehicle and is the door Lee-Brown ran to and entered. The Dodge then entered the freeway fleeing and eluding the police. Upon watching this video TFO Reagan recognized the Dodge as having a similar body style and color as well as having similar colored rims as the vehicle known to be operated by William Pope. The police officers reported the Dodge had a possible plate of ANK3228 but had a license plate cover over the plate. This plate number is similar to the plate on William Pope's Dodge which is AKX3238. A review of remote static electronic surveillance of **SUBJECT PREMISES 1** reflected the following:

21

a. At 8:03 p.m. three of the four garage doors to the auto shop are open and an unknown black male is observed running from the east towards the shop and entered the garage. The first garage door is observed closing.

b. At 8:04 p.m. the same unknown male is observed standing in the third garage door on a cell phone.

c. At 8:05 p.m. the unknown male reopened the first garage bay door and a white Dodge Durango known to be driven by **Edwards** quickly entered the lot and parked near the second and third door. **Edwards** was observed exiting the driver door quickly and going towards the third door pointing into the shop while interacting with the unknown male. Both the male and **Edwards** entered the third garage bay door.

d. At 8:06 p.m. **Edwards** ran back to the Durango and entered the driver seat and then quickly pulled the Durango into the third garage door, and the unknown male closed the door behind the vehicle.

e. At 8:07 p.m. **Edwards** was observed on his cell phone and then closed the fourth garage bay door.

f. At 8:09:20 p.m. **Edwards** was observed closing the first garage bay door and then opening the second door halfway. Then, a gray Dodge Charger matching the same appearance as the one from the fleeing incident and known to be operated by William Pope entered the second garage bay door. The garage bay door is then closed behind the vehicle.

g. At 8:14 p.m. a gray Infiniti is observed pulling into the lot and parking.

h. At 8:18 p.m. a subject with a similar build and clothing appearance to the driver of the Hyundai exited the shop along with a subject matching the physical characteristics of William Pope and **Edwards**. The two males believed to be Pope and the driver of the Hyundai entered the Infiniti and left the lot.

54. A review of the ping location date for **Edwards's** 2298 Phone reflected that the 2298 Phone had a ping radius that covered the location of the auto shop, **SUBJECT PREMISES 1**, and a review of the pen register data revealed a 414-750-9792 called **Edwards** at 8:01:20 p.m. for 36 seconds just prior to the unknown male running to the shop and **Edwards** returning to the shop. A second call with the same number began at 8:07:39 p.m. and lasted 1 minute 49 seconds. The time the call with this number was terminated was within 3 seconds of the Dodge Charger

pulling into the garage bay. Based on the aforementioned incident case agents believe that **Edwards** intentionally used his auto shop to assist William Pope and Lee-Brown in eluding police.

55. CHS #1 and CHS #2 reported that **Edwards** facilitated drug transactions to occur near North 69th Street and West Capitol Drive in Milwaukee, Wisconsin to any area around that intersection, near **Edwards**'s auto shop, **SUBJECT PREMISES 1**. CHS #1 and CHS #2 stated after conducting the drug transactions that **Edwards** would generally return to **SUBJECT PREMISES 1.** CHS #1 and CHS #2 reported that **Edwards** would conduct the transactions in areas outside **SUBJECT PREMISES 1** to avoid raising law enforcements attention to **SUBJECT PREMISES 1.**

56. Case agents conducted surveillance on July 19, 2022 and August 10, 2022, during which case agents observed **Edwards** at **SUBJECT PREMISES 1**, then depart from **SUBJECT PREMISES 1** in a vehicle to an area nearby and meet with persons and/or occupied vehicles. Case agents observed **Edwards** engage in short interactions with the vehicles and or person. **Edwards** was then observed returning back to **SUBJECT PREMISES 1.** Based on case agents' training, experience, and familiarity with this investigation, case agents believe that these interactions were consistent with mobile drug transactions.

57. On September 14, 2022 CHS #2 informed investigators that within the past seven days of the interview the CHS observed **Edwards** in possession of a gallon-sized zip lock bag containing a substance that the CHS knows through experience to be heroin. CHS #2 and **Edwards** were reportedly in the area of N. 70th and W. Capitol Drive in the City of Milwaukee. CHS #2 stated **Edwards** then returned to his auto shop at **SUBJECT PREMISES 1** and returned a short time later with a sandwich bag that contained a substance that the CHS knew to be crack cocaine.

23

58.     On April 14, 2023, case agents conducted a review of remote static surveillance on **SUBJECT PREMISES 1**, which depicted **Edwards** arriving at the location in the black Dodge Durango. At this time, an occupied Mazda CX5 was waiting in the parking lot. Upon **Edwards's** arrival, the male driver of the Mazda exited and entered the front passenger seat of the Dodge Durango.  After approximately 30 seconds, the Mazda driver exited the Dodge Durango, entered the Mazda, and then departed the parking lot.  **Edwards** was then observed exiting the driver seat of the Dodge Durango and entering **SUBJECT PREMISE 1.**  Based on their training, experience, and familiarity of this investigation, case agents believe that Edwards conducted a drug transaction at this time.

### SUBJECT PREMISES and Vehicle Information

59.     Case agents conducted a review of remote static surveillance located at **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2** during the month of April 2023 and found the following:

   a.  On April 7, 2023, **Edwards** was observed arriving at **SUBJECT PREMISES 2** at 7:30 a.m. in a black Dodge Durango and departing at 1:10 p.m.  **Edwards** was then observing arriving at **SUBJECT PREMISES 1** at 2:33 p.m.

   b.  On April 8, 2023, **Edwards** was observed leaving **SUBJECT PREMISES 2** at 12:43 p.m. in a black Dodge Durango and arriving at **SUBJECT PREMISES 1** at 1:15 p.m.

   c.  On April 9, 2023, **Edwards** was observed leaving **SUBJECT PREMISES 2** at 11:50 a.m. in a black Dodge Durango and arriving at **SUBJECT PREMISES 1** at 12:28 p.m.

   d.  On April 10, 2023, **Edwards** was observing leaving **SUBJECT PREMISES 2** at 12:52 p.m. in a black Dodge Durango and arriving at **SUBJECT PREMISES 1** at 1:10 p.m.

   e.  On April 11, 2023 **Edwards** was observed departing **SUBJECT PREMISES 2** in a black Audi station wagon at 11:54 a.m. and arriving at **SUBJECT PREMISES 1** at 1:12 p.m. in the Audi.

24

f. On April 18, 2023 **Edwards** was observed departing **SUBJECT PREMISES 2** in the early afternoon in a black Audi station wagon and arriving at **SUBJECT PREMISES 1** a short time later.

60.     Case agents have conducted reviews of remote static surveillance video, which records **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2**, and location data from phone numbers used by **Edwards**. This review leads case agents to believe that **SUBJECT PREMISES 2** is **Edwards's** primary residence, as static surveillance and his cell phone reflects he and/or his phone is located at **SUBJECT PREMISES 2** during a majority of the overnight hours. Additionally, within the last 30 days, location data for **Edwards's** 4801 Phone reflects that it is in the vicinity of **SUBJECT PREMISES 3** approximately once a day up to multiple times in a day.

61.     Case agents are aware that Daje Hunter has a 2021 Dodge Durango Hellcat VIN: 1C4SDJH90MC643328 registered in her name, and case agents through surveillance have observed Wisconsin license plate 341LXC affixed to the Dodge Durango.  A Wisconsin Department of Transportation check revealed the above-identified plates do not list to any vehicle and are registered to the previous business that occupied **SUBJECT PREMISES 1**.  Case agents have observed **Edwards** operating this vehicle, as recently as within the past week, and note that this vehicle was used during the controlled buy on February 6, 2023.

62.     Case agents are aware that Daje Hunter has a 2019 Mercedes Benz GLE registered to her with the Wisconsin license plate ANP8319.  Case agents have personally observed this vehicle being operated by Daje Hunter and **Edwards** with that license plate.

63.     Case agents have observed **Edwards** operating a black Audi Q7, bearing Wisconsin License plate of 344LXC, during the controlled buy on November 16, 2022. A Wisconsin

25

Department of Transportation check of that plate revealed it is registered to the previous business that occupied **SUBJECT PREMISES 1**.

64.     Case agents have observed **Edwards** operating a black Audi station wagon with silver or chrome trim around the entire bottom of the Audi and chrome trim around the window frame, as recently as April 19, 2023. Case agents have not been able to observe a license plate for this vehicle.

65.     Case agents observed a gray 2014 Audi S7 bearing WI Registration ASK355 in the parking lot of **SUBJECT PREMISES 1** on April 19, 2023.

66.     Case agents observed a black BMW 6 Series in the parking lot of **SUBJECT PREMISES 1** on April 12, 2023.

## TECHNICAL TERMS

67.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.   IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   b.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   c.   Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

26

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

70.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

71.     *Probable cause.*  I submit that if a computer, cellular telephone, or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

27

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

72.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the

28

times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on

29

a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

       c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

       d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.　　Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.　　I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

73.　　*Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

31

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

74. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the

32

warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

75. The warrant I am applying for would permit law enforcement to obtain from **Edwards** the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

76. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

77. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

78.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

79.     If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

80.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

81.     As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

34

82.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

83.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of **Edwards** to the fingerprint scanner of the device; (2) hold the device in front of **Edwards's** face to activate the facial recognition feature; and/or (3) hold the device in front of **Edwards's** face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## <u>CONCLUSION</u>

84.     Based on the facts contained within this affidavit, I believe there is probable cause to believe that **Rayvon D. Edwards** committed the crimes of distribution of controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

35

85.     Based upon the facts contained within this affidavit I believe there is probable cause for a warrant to search the **SUBJECT PREMISES** described in Attachments A-1, A-2, and A-3 and seize the items described in Attachment B.

**ATTACHMENT A-1**

Property to be searched

7210 W. Capitol Drive, Milwaukee, Wisconsin, to include all associated common spaces, basement, garage, outbuildings, and vehicles to include a black 2021 Dodge Durango Hellcat with VIN: 1C4SDJH90MC643328, a black 2019 Mercedes Benz GLE bearing WI Registration ANP8319, a black Audi Q7 bearing WI Registration 344LXC, a gray 2014 Audi S7 bearing WI Registration ASK355, a Black Audi Station wagon, and a black BMW 6 Series at this address. This property is used by Rayvon **Edwards**. This address is further described as an automotive repair shop/car dealership having blue and gray brick siding and green wood boards over the south facing windows. The structure has two sets of east facing pedestrian glass doors that lead into the main lobby of the auto shop and four overhead garage doors facing east leading into the auto garage portion of the structure. The structure has the numbers "7210" posted over the east facing pedestrian doors, which lead into the parking lot of the lot.



1

## ATTACHMENT B

Property to be seized

All evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (Distribution of and possession with intent to distribute controlled substances) and Section 846 (Conspiracy to possess with intent to distribute and to distribute controlled substances), those violations involving Rayvon Edwards, including:

1.      Controlled substances, controlled substance analogues, or listed chemicals;

2.      Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

3.      Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

4.      Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

5.      Firearms, ammunition, magazines, gun boxes, firearm purchase records or receipts, and other paraphernalia associated with firearms;

6.      Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

7.      Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

8.      Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting

1

names, addresses, purchases, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

9.      Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

10.     Cellular telephones, Smartphones, text messaging systems, and other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

11.     Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

12.     Indicia of occupancy, residency or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

13.     Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances; and

14.     Computers, cellular telephones, or storage media used as a means to commit the violations described above.

15.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

        a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

        b.      evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

        c.      evidence indicating the computer user's state of mind as it relates to the crime under investigation;

2

d.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.      evidence of the times the COMPUTER was used;

g.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.      records of or information about Internet Protocol addresses used by the COMPUTER;

j.      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k.      contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

3

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

This warrant authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of Edwards to the fingerprint scanner of a device found at the premises; and/or (2) hold a device found at the premises in front of Edwards's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device to search the contents as authorized by this warrant.

4